Question Submitted by: The Honorable Justin Wood, State Representative, District 26
2016 OK AG 2
Decided: 02/18/2016
Oklahoma Attorney General Opinions

Cite as: 2016 OK AG 2, __ __

 

¶0 This office has received your request for an official Attorney General opinion in which you ask a number of questions regarding the powers and duties of the Judicial Nominating Commission with respect to applicants for the position of Associate District Judge. Those questions include, in effect:
1. Whether the Judicial Nominating Commission must consider an applicant for the position of Associate District Judge if he or she meets the qualifications specified by constitutional provision and statute? 2. Whether the Judicial Nominating Commission may submit fewer than three names of legally qualified applicants to the Governor and to the Chief Justice for appointment? 3. Whether the Judicial Nominating Commission may use its own criteria in choosing applicants for the position of Associate District Judge, and if so, whether use of its own criteria is contingent on a certain number of applicants? 4. Whether the Judicial Nominating Commission may re-open an application process if it receives by a firm deadline set by the Commission the applications of three or more legally qualified applicants for the position of Associate District Judge? 
I.
Background
¶1 The Judicial Nominating Commission (or "Commission") stemmed from a reform movement with merit selection as its goal. Indeed, the Oklahoma Bar Association long supported merit selection, Jack N. Hays, Oklahoma Moves Forward in Judicial Selection, 6 Tulsa L. Rev. 85, 88 (1970), and the 1962 Conference on Modern Courts for Oklahoma stated in its consensus: "The objective of any method of selection should be to obtain judges free of political bias and collateral influence and possessed of qualities that will lead to the highest performance of their judicial duties." Modern Courts for Oklahoma, 46 J. Am. Jud. Soc'y. 150, 151 (Dec. 1962). 
¶2 In 1964, a bribery scandal led to the conviction of two Oklahoma Supreme Court justices and the impeachment of one, thereby advancing the reform movement's agenda. See Philip Simpson, The Modernization and Reform of the Oklahoma Judiciary 7 (Oct. 1994) (on file with author). Following the scandal, the Legislature proposed in 1967 a two-part legislative referendum that offered various levels of reform. See Philip Simpson, The Role of Partisanship in the Reform of the Oklahoma Judiciary 12 (Oct. 1996) (on file with author) http://ojs.library.okstate.edu/osu/index.php/OKPolitics/article/viewFile/907/816. 
¶3 On a white ballot, the people voted for a newly-organized court system (appellate and tribunal), with judicial vacancies filled by a non-partisan election system. Id. On a yellow ballot, the people voted on an appointment system for the selection of appellate judges. Id. Passage of the yellow ballot was contingent on the passage of the white ballot such that an appointment system for appellate judges would only be instituted if the people approved both ballots. Id. Then-Attorney General G.T. Blankenship rewrote the gist for the yellow ballot, clarifying that the constitutional amendment "establish[ed] [sic] Judicial Nominating Commission, selection of members, and fixing members' qualifications, tenure, powers and duties." Letter from Attorney Gen. G.T. Blankenship to Okla. Sec'y of State John Rogers (May 12, 1967) (on file with author) (emphasis added).
¶4 Both measures received a majority vote such that the entire reform package passed, including the yellow ballot's provisions for the appointment of appellate judges through use of the Judicial Nominating Commission. It is against this backdrop that we examine your questions.

II.
Authorities
¶5 Article VII-B, Section 3 of the Oklahoma Constitution identifies the Judicial Nominating Commission as a part of the Judicial Branch. See Okla. Const. art. VII-B, § 3. Section 3 further provides for the Commission's make-up, parsing out in detail the number of commissioners, who shall elect them, and the manner in which mixed party affiliation shall be achieved. See Okla. Const. art. VII-B, § 3. That Section also provides that:

The concurrence of the majority of Commissioners in office at the time shall be sufficient to decide any question, unless otherwise provided herein. The Commission shall have jurisdiction to determine whether the qualifications of nominees to hold Judicial Office have been met and to determine the existence of vacancies on the Commission.

Okla. Const. art. VII-B, § 3(e) (emphasis added). Further, Section 4 provides, in part, that the "Commission shall choose and submit to the Governor and Chief Justice of the Supreme Court three (3) nominees, each of whom has previously notified the Commission in writing that he will serve as a Judicial Officer if appointed." Okla. Const. art. VII-B, § 4 (emphasis added). 
¶6 As originally enacted, the provisions of Article VII-B only governed "the selection and tenure of . . . Justices of the Supreme Court and Judges of the Court of Criminal Appeals of the State of Oklahoma." Okla. Const. art. VII-B, § 1(a). Additionally, Article VII-B stated explicitly that "the provisions hereof may be extended." Id. And in 1980, the Legislature in fact extended the provisions of Article VII-B, mandating that the Governor shall use the services of the Commission in filling vacancies in the offices of district judge, associate district judge, or judge of any intermediate appellate court. Compare 1980 Okla. Sess. Laws ch. 272, § 28 (making use of the Commission mandatory) with 1971 Okla. Sess. Laws ch. 107, § 1 (making use of the Commission permissive). Today, the Governor is still required to use the Commission when filling a vacancy in those offices. See 51 O.S.2011, § 10(A). Your questions relate specifically to the Governor's use of the Commission in filling vacancies within the office of Associate District Judge.

III.
Discussion
The Judicial Nominating Commission is constitutionally vested with certain powers specific to the filling of judicial vacancies:[1] 

the power to determine whether the qualifications of nominees to hold Judicial Office have been met, and

the power to choose and to submit to the Governor and to the Chief Justice the names of three nominees.
¶7 Constitutional provisions are written "for the instruction of the people and the representatives of government, so that they may read and understand their rights and duties." Fent v. Fallin, 2014 OK 105, ¶ 12, 345 P.3d 1113, 1117. Consequently, "[w]ords used in a constitutional provision and an accompanying ballot title are to be construed in a way most familiar to ordinary people who voted on the measure." Id. It is only when an ambiguity is present in the constitutional provision that a search for meaning would extend beyond the instrument itself. S. Tulsa Citizens Coalition, L.L.C. v. Ark. River Bridge Auth., 2008 OK 4, ¶ 11, 176 P.3d 1217, 1220.
¶8 Here, Sections 3 and 4 specifying the Commission's powers with respect to filling vacancies plainly provide that "[t]he Commission shall have jurisdiction to determine whether the qualifications of nominees to hold Judicial Office have been met," Okla. Const. art. VII-B, § 3(e) (emphasis added), and to "choose and submit to the Governor and the Chief Justice of the Supreme Court three (3) nominees," Okla. Const. art. VII-B, § 4 (emphasis added). Those provisions clearly and expressly grant to the Commission three distinct powers. 

A. To exercise these powers, the Commission advertises vacancies, investigates, and evaluates applicants. 

¶9 The system of merit selection contemplated by the yellow ballot's appointment method is generally understood as a means of selecting judges through a nonpartisan commission of lawyers and non-lawyers that solicits, investigates, and evaluates applicants for judgeships.[2] The Commission has, in fact, called for applications and then investigated and evaluated applicants for years. 
¶10 First, the Commission invites applicants to apply for open judgeships by posting notices on its website and with the Oklahoma Bar Association. For example, on its website, the Commission posts notices for open vacancies, lists the qualifications that must be met, and specifies where an application form can be found and to where and by when it should be sent. (Okla. Jud. Nom. Comm'n, Judicial Vacancies, available at http://www.oscn.net/Sites/JudicialNominating Commission/Vacancies.aspx, last visited Nov. 15, 2015) 
¶11 Second, the Commission investigates applicants. The Legislature has acknowledged the Commission's power to do so by specifically allocating a full-time investigator for the purpose of conducting background checks for the Commission. Title 74, Section 150.34 of the Oklahoma Statutes provides that "[o]f the full-time-equivalent employees authorized for the Oklahoma State Bureau of Investigation, one employee shall be employed for the purpose of conducting judicial background investigations requested by the Judicial Nominating Commission." 74 O.S.2011, § 150.34. To conduct these investigative background checks, the Commission solicits a variety of information through the application process regarding a candidate, including education, work history, community involvement, criminal history, and financial history. 
¶12 Third, the Commission evaluates applicants. In doing so, the Commission uses the information gathered through the background checks and holds interviews, examining candidates' integrity, intelligence, experience, and temperament--ideals expressed in the Code of Judicial Conduct, see 5 O.S.2011, ch. 1, app. 4. The information gathered through this process is used differently, depending on which power the Commission invokes: its power to determine whether qualifications have been met, its power to submit, or its power to choose.

B. As to the first power, the Commission must determine whether the qualifications for holding judicial office as set by constitutional provision and statute have been met, and if an applicant meets those qualifications, the Judicial Nominating Commission must consider him or her for the positon of Associate District Judge. 

¶13 Section 3 of Article VII-B of the Oklahoma Constitution provides that the Commission must determine "whether the qualifications . . . to hold Judicial Office have been met." Okla. Const. art. VII-B, § 3 (emphasis added). It is thus plain that these qualifications must be elsewhere identified, and, indeed, Article VII, Section 8 of the Oklahoma Constitution provides that "[e]ach Associate District Judge shall be an attorney licensed to practice in the State of Oklahoma and an elector in the County at the time of filing; and they shall have such additional qualifications as prescribed by statute." Okla. Const. art. VII, § 8. Statute additionally prescribes that "[n]o person shall be eligible for appointment to . . . the office of associate district judge unless he has had a minimum of two (2) years of experience as a licensed practicing attorney, or as a judge of a court of record, or a combination thereof, within the State of Oklahoma." 20 O.S.2011, § 121.1.
¶14 As such, the qualifications for the position of Associate District Judge include that an applicant (1) be an attorney licensed to practice in the State of Oklahoma, (2) who has a minimum of two years' experience either as a licensed practicing attorney or as a judge of a court of record or a combination of both, and (3) is an elector of the County at the time of filing. See A.G. Opin. 84-9, at 28 (providing that "an appointee to an associate district judge position must be a registered voter of the appropriate district at the time he subscribes to his oath of office and assumes the duties of office"). Because, together, these requirements emphasize that such nominee "shall be" a licensed, practicing attorney with a minimum of two years of experience, we understand these requirements to mean that an applicant must have, at present, at least two years' experience and be an attorney in good standing. 
¶15 Further, to be legally qualified to hold judicial office, an applicant cannot be disqualified from holding office. For example, statute provides that any public officer or state employee who is convicted of accepting a bribe is forever disqualified from holding any other public office. 21 O.S. 2011, § 382; see also A. G. Opin. 1986-79 at 131 (recounting the crimes that carry permanent or temporary disqualification from office as a penalty). 
¶16 In exercising the power to ensure that qualifications are met, the Commission thus reviews the information collected through the investigation and evaluation process to ensure that it has received the applications of three legally qualified nominees. If an applicant meets these qualifications and is not otherwise disqualified, then he or she is legally qualified for the position of Associate District Judge and must be considered by the Commission.

C. As to the second and third powers, the Constitution specifically provides that the Commission chooses and submits the names of nominees for Associate District Judge. 

¶17 Section 4 of Article VII-B provides that the Commission "shall choose and submit to the Governor and the Chief Justice of the Supreme Court three (3) nominees, each of whom has previously notified the Commission in writing that he will serve as a Judicial Officer if appointed." Okla. Const. art. VII-B, § 4 (emphasis added). This constitutional provision plainly articulates two interrelated but distinct powers: (1) the power to choose and (2) the power to submit nominees, codifying the system of merit selection advanced in the 1967 legislative referendum. We first examine the Commission's power to submit nominees.

1. The Commission is constitutionally tasked with submitting the names of three legally qualified applicants to the Governor and to the Chief Justice for appointment. 

¶18 First, Section 4 plainly requires the Commission to submit to the Governor and to the Chief Justice of the Supreme Court the names of exactly three nominees. Okla. Const. art. VII-B, § 4. We earlier addressed this requirement in Attorney General Opinion 2006-2, there providing that "[i]f the Judicial Nominating Commission were to submit fewer than three nominees, the Commission's action would be in direct conflict with[] clear and unambiguous [constitutional] directive." A.G. Opin. 2006-2, at 16. This constitutional requirement remains unchanged. The Commission's power to submit thus requires it to submit no less than three names.
¶19 Similarly, the Commission's power to submit requires it to submit no more than three names. The constitutional requirement states that precisely three must be submitted, going so far as to include the numeral three. Read in tandem with the power to determine that the qualifications have been met, this power requires the Commission to submit the names of no less than and no more than three legally qualified nominees for appointment. We next address the Commission's power to choose.

2. The Commission is constitutionally tasked with choosing nominees, and it may do so using its own criteria when it receives the applications of more than three legally qualified applicants. 

¶20 "Choose" as contained in Section 4 is commonly defined as selecting one thing over another, "esp[ecially] with free will and by exercise of judgment." Webster's Third New International Dictionary 397 (3d ed. 1993) (emphasis added). As indicated above, Section 4 requires the Commission to submit the names of three legally qualified nominees. If the Commission only receives the applications of three legally qualified nominees, it need not choose amongst applicants. Instead, the Commission's role in that case is to simply submit the names of those nominees.[3] 

¶21 Where, however, the Commission receives the applications of more than three legally qualified applicants, it must of necessity employ its power to choose so that it can whittle the applicants down to three. The Commission does so by weighing the information gathered during the investigation and evaluation process. Because constitutional provision and statute are silent as to how the Commission chooses amongst applicants, the Commission may use whatever criteria it sets for itself in weighing the information gathered during its investigation and evaluation process, including the weighing of those categories of information identified above--education, work history, criminal history, experience, temperament, and the like. Indeed, the Commission has no choice in those limited instances but to employ its own criteria for considering and for choosing amongst applicants because neither constitutional provision nor statute provides such criteria. 

¶22 Finally, you ask whether the Commission may re-open an application process if it has received the applications of three or more legally qualified nominees. We examine this question below.

3. If the Commission receives the applications of three or more legally qualified nominees by a firm deadline set by the Commission, it may not re-open an application process but must submit those three names. 

¶23 Neither the Constitution nor the Commission's website provide any timeframe with which the Commission must comply in submitting the names of nominees. In fact, in Attorney General Opinion 2006-2, this Office acknowledged that "no deadline is set for the submission of the names of the qualified applicants to the Governor and the Chief Justice." A.G. Opin. 2006-2, at 16. Consequently, deadlines set by the Commission are self-imposed. 
¶24 Under certain circumstances, re-opening an application process may be necessary, where, for example, the Commission has not received the applications of three legally qualified nominees. see id. ("[I]f fewer than three qualified individuals initially express a willingness to serve in a judicial position, the Judicial Nominating Commission should continue the process until three qualified applicants are obtained . . . ."). If, however, the Commission has received the applications of three legally qualified nominees by a firm deadline set by the Commission, it should comply with its deadline. Re-opening the process to accept additional applications under such circumstances would do a disservice to those applicants who worked to comply with the firm deadline imposed. 

¶25 Is it, therefore, the official Opinion of the Attorney General that:
1. Section 3 of Article VII-B of the Oklahoma Constitution vests the Judicial Nominating Commission with the power to determine whether the qualifications for holding judicial office have been met, and if an applicant possesses the legal qualifications for holding judicial office as set by constitutional provision and statute and is not otherwise disqualified, then the Commission must consider that applicant. 
2. Section 4 of Article VII-B of the Oklahoma Constitution vests the Judicial Nominating Commission with the power to submit nominees, but Section 4 requires the Commission to submit no less than and no more than three legally qualified nominees to the Governor and to the Chief Justice for appointment. 
3. Section 4 of Article VII-B of the Oklahoma Constitution also vests the Judicial Nominating Commission with the power to choose nominees, but its power to choose nominees--and thus its power to employ its own criteria when so choosing--is only triggered when the Commission receives the applications of more than three legally qualified applicants. 
4. When the Judicial Nominating Commission has received the applications of three or more legally qualified applicants by a firm deadline set by the Commission, it may not re-open the application process for the consideration of additional applicants. 

E. SCOTT PRUITT
Attorney General of Oklahoma
CARA N. RODRIGUEZ
General Counsel to the Attorney General
FOOTNOTES
[1] The identified powers are not exhaustive. See Okla. Const. art. VII-B. 
[2] See American Bar Association, Judicial Selection 6 (June 2008), available at https://www.americanbar.org/content/dam/aba/migrated/JusticeCenter/Justice/PublicDocuments/judicial_selection_roadmap.authcheckdam.pdf (last visited Nov. 16, 2015).
[3] Of course, relating to the Governor and to the Chief Justice the information gathered by the Commission allows the Governor and the Chief Justice to make an informed decision in choosing amongst those nominees. 

 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
2008 OK 4, 176 P.3d 1217, 
SOUTH TULSA CITIZENS COALITION L.L.C. v. ARKANSAS RIVER BRIDGE AUTHORITY
Discussed

 
2014 OK 105, 345 P.3d 1113, 
FENT v. FALLIN
Discussed

Title 20. Courts

 
Cite
Name
Level

 
20 O.S. 121.1, 
Qualifications for Associate District Judges
Cited

Title 21. Crimes and Punishments

 
Cite
Name
Level

 
21 O.S. 382, 
Officers Receiving Bribes
Cited

Title 51. Officers

 
Cite
Name
Level

 
51 O.S. 10, 
Vacancies - Appointments - Special Elections
Cited

Title 74. State Government

 
Cite
Name
Level

 
74 O.S. 150.34, 
Employee to Conduct Judicial Background Investigations
Cited